**JUDGE DAVID GUADERRAMA**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | **EP19MC0207** |
| | § | |
| ROHIT ROHIT | § | CIVIL No. |
| | § | FILED UNDER SEAL |

### EMERGENCY EX PARTE[1] MOTION FOR ORDER OF AUTHORIZATION TO PROVIDE NON-CONSENSUAL MEDICAL EXAMINATION AND NON-CONSENSUAL HYDRATION

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW the United States of America, by and through the United States Attorney for the Western District of Texas, and hereby respectfully moves this Honorable Court for an Order, pursuant to 28 U.S.C. § 1651, authorizing the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), to provide non-consensual medical examination (orthostatic blood pressure examinations, physical examinations, EKG, lab testing, and urinalysis) and to non-consensually hydrate in the form of IV fluids, a detainee at the ICE El Paso Processing Center ("SPC"), El Paso, Texas. As grounds therefore, the following is stated:

### I. STATEMENT OF THE CASE

1. Detainee Rohit Rohit is a citizen of India. Exhibit 1, Declaration of ▓▓▓ ▓ ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓, DHS, ¶ 2. On July 12, 2018, Mr. Rohit entered the United States without inspection near Otay Mesa, CA. *Id.* at ¶ 3. Mr. Rohit was processed for Expedited Removal under section 235 of the Immigration and Nationality Act ("INA"). *Id.* On or about

---

[1] The U.S. Attorney's Office received an email and a G-28 Form from attorney Linda Corchado, Director of Legal Services, Las Americas Advocacy Center. Ms. Corchado informed this office that she represents Mr. Rohit in his immigration proceedings. However, she indicated she does not represent him in proceedings before the federal court.

August 29, 2018, United States Citizenship and Immigration Services ("USCIS") issued Mr. Rohit a Notice to Appear charging him as inadmissible under INA § 212(a)(7)(A)(i)(I) and 212(a)(6)(A)(i). *Id.* On October 9, 2018, an immigration judge denied Mr. Rohit's request for bond. *Id.* On January 3, 2019, Mr. Rohit filed an appeal before the Board of Immigration Appeals ("BIA"). *Id.* On May 31, 2019, the BIA dismissed Mr. Rohit's appeal. *Id.*

2. ███████ ███████, M.D., Staff Physician assigned to ICE Medical Referral Center at SPC states that Mr. Rohit's first documented missed meal was breakfast on July 9, 2019. Exhibit 2, Declaration of ███████ ███████, M.D., ¶ 4. At the ninth missed meal, on July 11, 2019, he was placed on official hunger strike protocol. *Id.* He has been observed consuming minimal amounts of water and he refuses intravenous fluids to maintain hydration. *Id.* ¶ 7. His hunger strike has thus far lasted 14 days and he has missed 46 meals. *Id.* ¶ 8.

3. Mr. Rohit has allowed basic medical examination to include blood pressure, temperature, oxygen saturation, weight, and height. *Id.* at ¶ 7. He has been observed consuming minimal amounts of water and has refused intravenous fluids to maintain hydration. *Id.* Prior daily urine dipstick analysis for Mr. Rohit has consistently shown dehydration. *Id.* Recent results have shown 4+ ketones which is indicative of severe dehydration. *Id.* He has refused to have his blood drawn for lab work and refused monitoring of urine output. *Id.*

4. Mr. Rohit is alert and oriented to person, place and time. *Id.* at ¶ 8. However, the medical staff and security personnel have observed Mr. Rohit ambulating with a slow gait and progressively becoming lethargic (lying in bed most of the time). *Id.* His current physical condition is fragile as he now appears frail, weak, with slow gait, and complaining of daily headaches and abdominal pain. *Id.*

     5.      Mr. Rohit has been counseled by ▬ ▬ about the effects of self-imposed dehydration and starvation on the body. *Id.* at ¶ 12.

     6.      ▬ notes,

> [p]atients suffering from starvation and dehydration follow a predictable pattern of progressive kidney failure, liver failure, heart failure, and death. This will occur if Mr. Rohit continues his hunger strike.

*Id.* at ¶ 9.

     7.      ▬ ▬ further notes:

> Dehydration produces a fluid volume imbalance in the body, which in combination with all the other factors could lead to an arrhythmia, heart attack, and major body organ failure. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted.

*Id.* at ¶ 11.

     8.      It is the informed medical opinion of ▬ ▬ that:

> at this stage of the hunger strike, he has reached a point where he will require immediate medical intervention, to include non-consensual hydration in the form of IV fluids in the next 24-48 hours to prevent further deterioration and serious medical complications. Also, it will be necessary to perform laboratory tests and physical evaluation on a consistent basis to monitor and assess his clinical condition. If his laboratory tests reveal other conditions requiring medical attention, it may be necessary to administer such medications intravenously.

*Id.* at ¶ 13.

     9.      ▬ ▬ further states:

> A court order is being sought prior to his condition decompensating to a critical juncture. Involuntary medical examinations (orthostatic blood pressure examinations, physical examinations, EKG, lab testing, and urinalysis) will be pursued only to assess his medical state and determine whether Mr. Rohit needs further treatment to prevent injury, malnourishment, organ failure, or loss of life due to his self-imposed hunger strike. Involuntary medical evaluation and non-consensual hydration would be accomplished through the use of physical and/or chemical restraints should Mr. Rohit become combative or aggressive during medical interventions in order to ensure the patient's and medical staff's safety.

*Id.* at ¶¶ 14-15.

10. While the medical issues have been outlined by ▮▮ ▮▮▮▮▮, the institutional issues as they relate to safety and the ongoing management of the detention center are outlined by ▮▮ ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮, DHS, ICE, El Paso Field Office. *See* Ex. 1.

## II. THE CASE LAW ON FORCE FEEDING

Courts have addressed the issue of force-feeding detained individuals, although most cases have involved inmates within penal institutions.[2] The United States Court of Appeals for the Second Circuit upheld a United States District Court's order to force feed a prisoner who was on a hunger strike for political and religious reasons. The court found that:

> Although Doe, as civil contemnor, has been convicted of no crime, the institution where he is housed is still responsible for his care while incarcerated. Other compelling governmental interests, such as the preservation of life, prevention of suicide, and enforcement of prison security, order, and discipline, outweigh the constitutional rights asserted by Doe in the circumstances of this case.

*In re: Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998).

While convicted prisoners retain a limited right to decline treatment, prison officials may compel a prisoner to accept treatment when, in the exercise of professional judgment, they deem it necessary to carry out valid medical and penological objectives. *Pabon v. Wright*, 459 F.3d 241,

---

[2] A hunger strike that is intended to convey a particularized message and has a high likelihood of conveying that message is protected by the First Amendment. U.S.C.A. Const. Amend. 1; *see Stefanoff v. Hays County, Tex.*, 154 F.3d 523, 527 (5th Cir. 1998)(per curiam) citing *Texas v. Johnson*, 491 U.S. 397 (1989). So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, prison officials are accorded latitude in fashioning restrictions on time, place and manner of communications. *Stefanoff*, 154 F.3d at 527; *In re Soliman*, 134 F. Supp. 2d 1238, 1254 (N.D. Ala. 2001) (finding that force-feeding a hunger-striking immigration detainee did not violate inmate's First Amendment rights), vacated as moot, *Soliman v. United States*, 296 F.3d 1237 (11th Cir. 2002). Such restrictions must be reasonably related to a legitimate penological interest. *See Brewer v. Wilkinson*, 3 F.3d 816, 824 (5th Cir. 1993). In the instant case, Mr. Rohit has communicated the reason for his hunger strike is his discontent with his continued detention in ICE custody and dissatisfaction with the outcome of his immigration case. Ex. 2, at ¶ 5.

252 (2d Cir. 2006)("[A] prisoner's right to refuse medical treatment need not be honored if legitimate penological interests require the prisoner to be treated. If prison officials, including doctors, identify situations in which they reasonably believe that treatment is required, notwithstanding the prisoner's asserted right to refuse it, the right must give way.").

Federal courts that have considered similar issues relating to the force-feeding of a person in custody, whether the person was a convicted prisoner, a pretrial detainee, or a person held pursuant to a civil contempt order, have upheld the constitutionality of doing so. *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) ("Martinez's claim that he was force-fed also fails to state a constitutional claim"); *Hurrey v. Unknown TDCJ Corr. Officer A*, No. 2:07-CV-226, 2009 WL 3645638, at *4 (N.D. Tex. Nov. 4, 2009) ("Prison officials are not authorized to allow an inmate to harm himself or commit suicide by fasting. Force-feeding an inmate under those circumstances is not a violation of his civil rights."). *See also Garza v. Carlson*, 877 F.2d 14, 17 (8th Cir. 1989) (although the prisoner did not receive force feeding, the "preservation of prisoners' health is certainly a legitimate objective, and prison officials may take reasonable steps to accomplish this goal."); *In re Sanchez*, 577 F. Supp. 7, 8-9 (S.D.N.Y. 1983) (Government's application for order permitting force feeding of prisoners who was in imminent danger of suffering permanent bodily damage as a result of complications arising from malnutrition and dehydration would be granted.). *See also Owens v. Hinsley*, 635 F.3d 950, 954 (7th Cir. 2011) citing *Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006)("prison administrators have a right and a duty to step in and force an inmate to take nourishment if a hunger strike has progressed to the point where continuation risks serious injury or death.").

In the specific context of an alien in immigration detention, several district courts have found that, an immigration custodial facility's determination that it is medically necessary to force-

5

feed a detainee on a hunger strike, does not violate the detainee's constitutionally protected rights. *See, e.g., In re Soliman,* 134 F. Supp. 2d at 1253–54; *In re Fattah,* No. 08-MC-164, 2008 WL 2704541, at *3–4 (M.D. Pa. July 8, 2008); *Dep't of Homeland Sec. v. Ayvazian,* 15-23213-CIV, 2015 WL 5315206, at *4 (S.D. Fla. Sept. 11, 2015). *See also Aamer v. Obama,* 953 F. Supp. 2d 213, 221 (D.D.C. 2013), aff'd on other grounds, 742 F.3d 1023 (D.C. Cir. 2014)("As his custodian, the United States cannot "allow" any person held in custody to starve himself to death. Whatever the medical ethics for a person at liberty, the United States as custodian has additional obligations. Numerous courts have recognized the Government's affirmative duty to prevent suicide and provide life-saving nutritional and medical care to persons in custody.").

The *Soliman* court noted that the government presented three interests in force feeding the detainee: (1) concerns for the maintenance and security of operations within the facility; (2) concerns for the preservation of his life; and, (3) concerns over the administrative costs and burdens of the hunger strikes. *Soliman,* 134 F. Supp. 2d at 1253. After analyzing these three interests in light of the factors set out in *Turner v. Safley,* 482 U.S. 78, 84 (1987), the court found the practice of force feeding the detainee to be reasonable and did not offend the First Amendment. *Id.*

Therefore, the Court should allow ICE to perform non-consensual hydration and non-consensual medical evaluation to assure Mr. Rohit's condition does not decompensate to a critical juncture.

### III. THE EFFECTS ON THE INSTITUTION

Mr. Rohit is in the lawful custody of ICE pursuant to 8 U.S.C. § 1226. Mr. Rohit's legal status insofar as detention is concerned is likened to that of a pretrial detainee, since he is not being held pursuant to a sentence of incarceration for the commission of a crime. *Bell v. Wolfish,* 441

U.S. 520 (1979). As his custodian, ICE is responsible for providing Defendant with such basic necessities as food, living space, and medical care that is consistent with the due process clause. *Hamm v. Dekalb County*, 774 F.2d 1567, 1572 (11th Cir.), cert. denied, 475 U.S. 1096 (1985).

▬▬▬▬▬▬ concerns about the adverse effects on the institution are very real. *See* Ex. 1. *Cleavinger v. Saxner*, 474 U.S. 193, 194-96 (1985) provides a real life example where, after an inmate's death at the institution hospital, inmates engaged in a work stoppage to protest his death because of their perceptions of the institutions' medical care.

There have been a number of cases where inmate suicides were at issue, and in the Eleventh Circuit, prison officials have an obligation to prevent prisoner's suicides when they are aware an inmate is suicidal. *See Edwards v. Gilbert*, 867 F.2d 1271, 1275 (11th Cir. 1989)(citing examples where defendants were denied summary judgment when they were aware of decedents' suicidal tendencies).

▬▬▬▬▬▬ concerns have validity and his judgment is entitled to deference from the court. The Supreme Court has repeatedly held that detainee officials have broad administrative and discretionary authority over the institutions that they manage. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983), abrogated in part on other grounds by *Sandin v. Conner*, 515 U.S. 472 (1995). Broad discretionary authority is necessary because the administration of a prison is at best an extraordinarily difficult undertaking. *See Wolff v. McDonnell*, 418 U.S. 539, 566 (1974)(discussing the discretion necessary for disciplinary proceedings). The DHS has a responsibility to maintain order and safety. Accordingly, discretion is granted in the implementation of policies which further these goals. *See e.g., Bell*, 441 U.S. at 546. Institution administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that, in their judgment, are needed to maintain institution

security. *See e.g. id.* at 546-47. When the action taken appears to be a rational response to a security problem and there is no evidence that the response is exaggerated, a court should defer to their expert judgment. *See id.* at 548.

There must be a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Bell*, 441 U.S. at 546, citing *Wolff*, 418 U.S. at 556. Thus, a restriction which infringes on constitutional rights is valid if imposed for reasons of security. *See Bell*, 441 U.S. at 546-47. Central to all other correctional goals is the security of the institution itself. *Pell v. Procunier*, 417 U.S. 817, 823 (1974). Maintaining institution security and preserving internal order and discipline justifies the limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees. *See Bell*, 441 U.S. at 546. Prison officials must be permitted to take steps to forestall threats of institution disruptions. "[T]hey must be permitted to act before the time when they can compile a dossier on the eve of a riot." *See Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132-33 & 133 n.9 (1977).

Thus, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ concerns, for maintaining safe and orderly institution operations, including his concerns for potential security problems if the medical staff is not allowed to conduct involuntary medical examinations, should be accorded deference.

Attached to this motion are the Declarations of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, and ▓▓▓▓▓▓▓▓

### IV. CONCLUSION

Therefore, for all of the above-stated reasons, the movant prays for an order authorizing the medical staff at DHS, ICE, SPC or other providers, who are under contract with ICE to provide for the medical care of detainees, to provide non-consensual medical examination (orthostatic

blood pressure examinations, physical examinations, EKG, lab testing, and urinalysis) and to non-consensually hydrate in the form of IV fluids, for thirty (30) days to assure Mr. Rohit's condition does not decompensate to a critical juncture. Further, if after the medical providers perform the involuntary medical examinations, the medical providers feel that in their medical judgment, more intrusive medical procedures are necessary to preserve the life and health of Mr. Rohit, ICE will seek further Court approval. The movant respectfully attaches hereto a proposed Order should this Honorable Court find this Motion meritorious.

Respectfully submitted,

**JOHN F. BASH**
UNITED STATES ATTORNEY

**ANGELICA A. SAENZ**
Assistant United States Attorney
Texas State Bar No.24046785
700 E. San Antonio, Ste. 200
El Paso, Texas 79901
Office: (915) 534-6884
Facsimile: (915) 534-3490
Email: Angelica.Saenz@usdoj.gov
*Attorneys for United States*

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

IN RE: §
§
ROHIT ROHIT § CIVIL No. _____
§

### DECLARATION OF ███████

In accordance with 28 U.S.C. § 1746, I, ███████, make the following unsworn declaration, under penalty of perjury, pertinent to the above-styled and numbered cause:

1. I am employed as the ███████ with the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), in the El Paso Field Office. I am currently assigned to the El Paso Processing Center (SPC) in El Paso, Texas and have been serving in this capacity since October 28, 2018.

2. Detainee Rohit ROHIT, A215 813 619, is a citizen of India who is currently detained at the SPC.

3. ROHIT entered the United States without inspection on or about July 12, 2018, near Otay Mesa, CA. He was initially processed as an Expedited Removal under section 235 of the Immigration and Nationality Act (INA). On or about August 29, 2018, USCIS issued ROHIT a Notice to Appear charging him as inadmissible under INA section 212(a)(7)(A)(i)(I) and 212(a)(6)(A)(i). On October 9, 2018, an immigration judge denied ROHIT's request for bond. On January 3, 2019, ROHIT was ordered removed to India. On January 31, 2019, ROHIT filed an appeal before the Board of Immigration Appeals (BIA). On May 31, 2019, the BIA dismissed ROHIT's appeal.

4. Detainee ROHIT was placed on hunger strike protocol on July 11, 2019, after missing nine meals, and is currently refusing nutrients and medical treatment to sustain his life. ICE has made reasonable efforts to persuade ROHIT to comply with necessary medical treatment, to no avail. The medical staff at the SPC is closely monitoring his condition.

5. The medical staff at the SPC has informed me that if detainee ROHIT continues to refuse necessary nutrients and medical treatment, it will be necessary to perform laboratory tests and physical evaluations to monitor and assess his clinical condition in order to save his life.

6. The death of a detainee as a result of a hunger strike would seriously affect the operations of ICE at the SPC and would adversely affect ICE efforts to maintain good order of the institution in the following ways:

    a. Perceptions of other ICE detainees at the SPC may be affected and could lead to acts of detainee violence and disruption. Other detainees may conclude that medical staff simply let the detainee die, without doing anything to save his life. Some detainees would almost certainly and quickly form such a conclusion. This could easily lead to acts of disruption, e.g. food strikes, and violence by detainees acting either alone or in groups. I am concerned that these acts would be directed against staff (including medical staff) or against institutional property, to express detainees' anger, resentment and frustration.

    b. Tensions between detainees and staff in the unit where the detainees are being housed and throughout the institution in general will be heightened and increased, making almost all aspects of institutional operation more difficult for staff to perform.

    c. For a detainee to cause his own death without staff intervention would thwart the obligation of staff to render appropriate medical care and prevent detainee suicides. Other detainees might then decide to commit suicide by starving themselves to death.

    d. Other detainees will start hunger strikes as attempts to manipulate staff to obtain various benefits and privileges.

    e. Some detainees will merely voice threats through a hunger strike, gaining additional staff attention (especially attention from medical staff), thus making staff apprehensive in their approach to such detainees.

7. For the reasons stated above, the adverse effects resulting from ROHIT's clinical conditions would harm the Department's ability to operate in a safe and orderly manner.

Executed this 24th day of July, 2019.

U.S. Department of Homeland Security
U.S. ICE
El Paso, Texas